IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

KAREN JAYNE NORDELL,            )
                               )
        Petitioner,            )
                               )
     v.                        )CIVIL ACTION NO 2:07CV31- MHT
ALABAMA DEPARTMENT OF          )
MENTAL HEALTH & MENTAL         )
RETARDAION, et al.,            )
                               )
        Respondents.           )

<u>MOTION TO DISMISS OR IN THE ALTERNATIVE ANSWER</u>

Come now Respondents, Alabama Department of Mental Health and Mental Retardation [herinafter Department]; Greil Hospital a DMH/MR psychiatric facility; Allen Stewart, Greil's current Director and Dr. Walter J. Crook, a former psychiatrist of Greil Hospital, and answer the petition in this cause as follows:

I.    *Summary of the Case and the Facts*

Ms. Karen Nordell is no longer receiving care and treatment at Greil Hospital; after her pyschosis was stabilized she was released to the Magnolia Group Home in Troy, Alabama. The Magnolia Group Home is not under the auspices of the Department.

On January 31, 2006, Mr. A.L. Heard, a Montgomery Correctional Officer, after witnessing Ms. Nordell exhibit violent behavior, threatening to kill inmates and officer and throwing feces on the walls, filed a petition for the involuntary commitment (Exhibit A). On February 2, 2006, a commitment hearing was held before Judge Reese McKinney pursuant to the Ala. Code § 22-52-9 (1975). Ms. Nordell was represented by Attorney Chenoa Vick. After the hearing, Judge Reese McKinney found that Ms. Nordell met the commitment criteria as outlined in Ala. Code § 22-52-10.4 (1975) (Exhibit B).

On February 3, 2006, Ms Nordell was admitted to Greil Psychiatric Hospital. Upon admission to the psychiatric unit, she was still in restraints. She was very loud and threatening staff. She was using profanity, and spitting and speaking in a raspy voice. She was cursing loudly and using racial slurs. Multiple p.r.n. medications had to be given in order to get her to calm down. She was transferred into Greil Hospital restraints and further p.r.n. medication had to be given to get the patient to calm down. She was extremely agitated and very psychotic and uncooperative (Exhibit C at page 2, paragraph 6).

Upon admission, Ms. Nordell was given a provisional diagnosis of Bipolar I Disorder and her diagnosis was later changed to Paranoid Schizophrenia. She was started on Risperal, Klonopin, Trazodone, and Depakote. She was agitated and using profanity initially during the hospitalization. She was very uncooperative and initially refused to have her physical exam done and refused to take a shower. Her appearance was disheveled (Exhibit C at page 2, paragraph 7).

On February 3, 2006 Dr. Crook determined that due to Ms. Nordell's psychiatric condition the appropriate course of treatment would have to include the administering of psychotropic medications. Since the patient was unable to consent to the administration of psychotropic medication, as required by the Department of Mental Health's policy 430-20 (Exhibit D), he executed the appropriate paper work authorizing the emergency administration of psychotropic medication. Dr. Crook determined that an emergency situation existed which constituted an exception to the requirement for informed consent. An emergency

exists when in the opinion of the treating physician, there is a probability of injury to the patient or to other persons (Exhibit C, page 2, paragraph 8).

When the treatment team met to devise Ms. Nordell's master treatment plan, Ms. Nordell refused to talk to any staff stating she knew her rights and that she was in the CIA and the police department had refused to cooperate with her requested examinations. No prior history was known on Ms. Nordell except that she was in Bryce Hospital on a previous occasion. She was very aggressive upon admission and had to be restrained. She spoke in a very hostile manner when she would speak. Depakote and Risperdal were increased. She stayed in her room excessively initially. During the hospitalization she came out of her room more and was more active. She would not attend groups and classes initially (Exhibit C, page 2-3, paragraph 9).

On March 24, 2006, per Departmental policy, Dr. Crook sought a second opinion in reference to the continued need for the emergency administration of psychotropic medication to Ms. Nordell, and Clemmie Palmer, M.D., concurred that the patient continued to present an unsafe situation or would continue to needlessly suffer mental distress and deterioration of function if not treated. It was their combined professional opinions that administration/continuation of medication was clinically necessary at that time (Exhibit C, page 3, paragraph 11).

Ms. Nordell stayed in bed excessively initially in the hospitalization, stating that the medication made her sleep day and night. She complained of sedation persistently which caused her to stay in bed day and night. Ms. Nordell

was tried off all medications on two different occasions for approximately two weeks each period and she continued to stay in bed all day and night. Therefore, her staying in bed was not considered to be secondary to the medication. She complained of sedation and spent most of the time in bed even on the 200 mg of Seroquel. The Seroquel was discontinued to see how she would do off any psychotic medication and she continued to stay in bed. On 05/20/2006 Abilify 15 mg p.o.q.p.m. was begun. The Abilify was increased to 15 mg p.o.b.i.d.

Ms. Nordell continued to be delusional and could describe elaborately delusions regarding an ex-boyfriend, espionage, Presidents Bush and Clinton. After the agitation initially during her hospitalization, she did not exhibit any physically or verbally threatening behavior (Exhibit C, page 3, paragraph 13).

On September 6, 2006, Mr. Allen Stewart, Director of Greil Hospital filed a Petition for Involuntary Commitment (Exhibit E).[1] On September 8, 2006 pursuant to Ala. Code §22-52-9 (1975), a hearing was held and Ms. Nordell was represented by Attorney Will Barefoot. After the hearing, Temporary Probate Judge, Karen Laneaux, found that pursuant to Ala. Code §22-52-10.4 (1975) the commitment criteria had been met and ordered Ms. Nordell committed back to Greil Hospital for a period not to exceed 150 days (Exhibit F).

Ms. Nordell eventually started spending more time out of her room. She tended to rock back and forth constantly. She was thought to have akathisia. She appeared to be having difficulty sitting still and was restless. Inderal was attempted in order to treat this;

---

[1] Due to an administrative error, Ms. Nordell's petition to renew involuntary commitment was not filed in a timely manner, therefore, Mr. Stewart had to file a new petition for involuntary commitment. An order for involuntary commitment expires within 150 days, so a petition to renew involuntary commitment must be filed prior to the expiration of that 150 days.

however, she stated she has a history of hypertension.  She was eventually evaluated for hypertension and was found to have it.  She stated that she was treated for hypertension in the past successfully with Toprol; therefore, the Inderal was discontinued and she was placed on Toprol instead.  There was, however, only slight improvement in her akathisia (Exhibit C, page 4, paragraph 14).

On January 9, 2007, Ms. Nordell, a patient of Greil hospital at that time, filed a pro se complaint challenging her confinement in Greil Hospital and the administration of psychotropic medications (Exhibit G).

On January 29, 2007, Allen Stewart, filed a petition to renew Ms. Nordell's inpatient commitment (Exhibit H).  On February 2, 2007, a recommitment hearing was held and Ms. Nordell was represented by Attorney Ed Parish.  After the hearing, pursuant to Ala. Code §22-52-10.6 (1975), Special Probate Judge, William R. Davis, found that the recommitment criteria had been established and issued an order recommitting Ms. Nordell to Greil Hospital for a period not to exceed one year (Exhibit I).

Eventually Ms. Nordell's affect became pleasant.  She did not mention her delusion regarding "conspiracy and espionage" unless asked.  She had no further behavior problems.  Lasix was also added to treat her hypertension.  She was tried on an another trial of Risperdal up to 10 mg q.p.m. with Haldol 10 mg p.o. q.p.m. added to the Risperdal.  This regimen was ineffective.  The Haldol was changed to Navane which was used up to 20 mg q.p.m.  Her delusions persisted.  An attempt was made to treat her anxiety and akathisia with Klonopin 1 mg p.o. t.i.d. but this was unsuccessful and the Klonopin was decreased and eventually weaned and discontinued.  She was started on Invega and weaned off the other antipsychotics and she appeared to have fewer side

effects to the Invega.  She was taken off Navane completely as well as Risperdal.  She continued to have delusional thinking but she was pleasant when approached.  She did get upset from time to time about getting caffeinated coffee but otherwise she was pleasant and she did not bring up delusional thinking unless asked (Exhibit C, page 4, paragraph 15).

By February 14, 2007, Ms. Nordell had finally gained the capacity to consent to the administration of psychiatric medications and she consented.  This consent was in effect until she was discharged on April 3, 2007. (Exhibit C, page 4, paragraph 17 and Exhibit J).

Upon Dr. Crook's recommendation and with the consensus of the treatment team, Ms. Nordell was discharged on April 3, 2007 in improved condition.  She was discharged to the Magnolia Group Home in Troy, Alabama. She is to have close follow up with the mental health center and continue her medications exactly as prescribed. She still had some delusional thinking but had no behavioral problems.  Her sleep and appetite were good.  Invega was decreased from 12 mg to 9 mg due to slurred speech.  Her "anxiety attacks" improved.  She had no suicidal or homicidal ideation.  She was placed on Lexapro to help with anxiety.

Ms. Nordell has not been a patient at Greil Psychiatric Hospital since April 3, 2007.

*II.    Discussion of Legal Issues*

*A.    The Petitioner's Petition for Writ of Habeas Corpus is due to*

*be dismissed because the petitioner is no longer in the Department's custody, thus rendering the petition moot and eliminating the "case-or-controversy" jurisdictional requirement.*

As noted above, Petitioner came into the department's custody initially after a petition for involuntary commitment was filed with the Montgomery County Probate Court. The order committed the Petitioner to the Department for a period not to exceed one hundred and fifty, (150) days. Subsequent to the initial commitment order, Ms. Nordell was committed a second time and subsequent to the second commitment, Ms. Nordell's commitment order was renewed.

The Petitioner's release from the Department on April 3, 2007, causes her petition for habeas corpus relief to be moot because it no longer presents a case-or-controversy pursuant to Article III, §2 of the Constitution of the United States. That being the case, this court lacks jurisdiction to hear this petition. *See Lewis v. Continental Bank Corp.,* 494 U.S. 472 (1990).

In the typical post conviction habeas corpus case where the petitioner has been released from custody, the Court looks to see whether there has been some "collateral consequence" of the conviction and/or associated confinement, a concrete and continuing injury, on which to base maintenance of the action. *Lane v. Williams,* 455 U.S. 624 (1982); *Spencer v. Kemma,* 523 U.S. 1 (1998). The Supreme Court in *Carafas v. LaValle,* 391 U.S. 234 (1968) *citing Fiswick v. United States,* 329 U.S. 211 (1946) disassociated the concepts of mootness and custody and held that because of the "disabilities or burdens" that may flow from a petitioner's conviction, a petitioner who is released unconditionally or finishes

serving his sentence during the pendency of his habeas corpus proceedings has "a substantial stake in judgment of conviction which survives the satisfaction of the sentence imposed on him, that on account of the "collateral consequences" the case is not moot, and the habeas corpus relief may be granted. The court pointed out that, in consequence of petitioner's conviction, he could not engage in certain businesses, serve as an official of a labor union for a specified period of time, vote in any state election or serve as a juror.

Ms. Nordell's case is distinguishable in that first, there was no conviction. Ms. Nordell was committed to the Department after being afforded procedural due process in a hearing where competent experts offered testimony supporting the allegations of her need for inpatient psychiatric treatment. Secondly, once Ms. Nordell was released from Greil Hospital on April 3, 2007, there were no collateral consequences. Currently, she has the same rights and privileges any another other citizen of the State of Alabama possess, with the exception of purchasing a hand gun. In fact it would be a discriminatory if any one attempted to abolish any of her rights and privileges, based on the fact that she suffers from a mental illness.

Ms. Nordell is entitled to the same liberties and freedoms of any other person who has not been committed to a State psychiatric hospital and in fact she can not be returned to the Department without being afforded procedural due process. There is no longer "case or controversy" and likewise no collateral consequences.

B.     Even if it is determined that the court has jurisdiction to hear this matter, the Petitioner's Petition for Writ of Habeas Corpus is not due to be granted because the actions in this matter did not result in a decision that was contrary to, or involved an unreasonable application of , clearly established Federal law as determined by the Supreme Court of the United States; nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" as required by 28 U.S.C. §2254 (d)(1).

As noted above, Ms. Nordell's commitments and renewal of commitments did not involve the application of Federal law, they were based on State law provisions and the decisions made by the Probate Judge, Temporary Probate Judge and Special Probate Judge, were not unreasonable determinations of the facts in light of expert opinions offered by competent and qualified expert clinicians.

C.     Petitioner has failed to exhaust State remedies prior to seeking Federal remedies as required by 28 U.S.C. §2254 (b) (1) (A).

According to Ala. Code §22-52-15 (1975), an appeal from an order of the probate court granting a petition seeking to commit a respondent to the custody of the department or designated mental health facility as the court may order lies to the circuit court for trial de novo unless the probate judge who granted the petition was learned in the law, in which case the appeal lies to the Alabama Court of Civil Appeals on the record.

Ms. Nordell had five days after each of her three commitment hearings to file an appeal challenging the validity of the orders for commitment. During each of the three hearings, Ms. Nordell was represented by a Guardian ad Litem and after each hearing she and her counsel failed to file an appeal.

D.    *Governmental Immunity of State Entities and Actors*

To the extent that damages are sought against DMH/MR, Greil Hospital or any officials thereof in their official capacities, those actions are barred by the Eleventh Amendment. *Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed 1114 (1978). To the extent that Nordell seeks relief against state officials for violations of state law, this too is barred by the Eleventh Amendment. *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *Burch v. Apalachee Community Mental Health Services, Inc.,* 840 F. 2d 797, 801 n. 8 (11th Cir. 1988), cert. granted, 489 U.S. 1064, 109 S. Ct. 1337, 103 L.Ed.2d 807 (1989) *and judgment aff'd,* 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed 100 (1990).

E.    *Individual Capacity Claims*

To the extent that damages are sought against Commissioner Houston, Director Allen Stewart and Dr. Crook in their individual capacities, they are entitled to qualified immunity. *See Anderson v. Creighton,* 438 U.S. 635m 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In light of Ms. Nordell's mental illness history, professional assessments and treatment, and testimony offered by expert

clinicians in each hearing, actions taken by officials to continue her treatment at a psychiatric facility were objectively reasonable. *See Harlow v. Fitgerald.*

### III.    CONCLUSION

In light of the above, the Respondents assert that this case should be dismissed for want of jurisdiction. Alternatively, given the well documented mental history of this petitioner and the state court proceedings that precipitated her commitments, the DMH/MR, Greil Hospital and their officials pray that this Court finds that the Petitioner has demonstrated no basis for habeas corpus relief.

Respectfully Submitted, this the 21st day of June, 2007.

TROY KING, KIN047
ATTORNEY GENERAL

/s/ Tamara R. Pharrams
TAMARA R. PHARRAMS PHA001
Assistant Attorney General
Alabama Department of Mental Health &
Mental Retardation
100 N. Union Street
P.O. Box 301410
Montgomery, AL  36130-1410
(334)242-3038 (Phone)
(334)242-0924 (Fax)
tamara.pharrams@mh.alabama.gov

Attorney for Respondents

CERTIFICATE OF SERVICE

I hereby certify that I have electronically filed the foregoing with the Clerk of the Court using the CM/ECF system as well as served a copy of the foregoing Motion to Dismiss and in the alternative Answer upon the petitioner by placing a copy of the foregoing in the U.S. Mail, postage prepaid and submitting it to the following address on this the 21st day of June, 2007.


Karen Nordell (Pro se)
Magnolia Therapeutic Group Home
826 Park Street
Troy, Alabama 36081


/s/ Tamara R. Pharrams
TAMARA R. PHARRAMS

# EXHIBIT

# A

HEARING DATE: Feb. 2, 2006 at 10:00 A.M

## IN THE PROBATE COURT FOR MONTGOMERY COUNTY

**KAREN NORDELL**                     CASE NO. 06-C 88
**RESPONDENT**

## PETITION FOR INVOLUNTARY COMMITMENT

Comes petitioner, **A.L. Heard** ; and respectfully represents unto your Honor that **Karen Nordell** is **54** years of age and a resident of **Montgomery**, Alabama; residing at **Homeless** and is currently at the **Montgomery City Jail** and that the petitioner has reason to believe that said person is mentally ill; and that such beliefs are based on specific behavior, acts, attempts, or threats, which are specified and described in detail as follows: **She was placed in the city jail for criminal trespass 3rd. She is experiencing auditory and visual hallucinations. The petitioner reports she is very violent and has threatened to kill the officers and inmates. She is throwing feces and water out on the floor and is cursing and screaming all the time. The petitioner feels she is a threat to herself and others.**

W/F / Ht.5'9" Wt. 200lbs Hair: blonde  Eyes: hazel:  Health: fair

**WHEREFORE**, petitioner prays that the Court will take jurisdiction of this matter, that a day be set for a hearing on this petition; that notice of the date, time and place of the hearing be given to the respondent and that a Guardian ad Litem be appointed to represent said respondent.

Petitioner's relationship to respondent:

I do solemnly swear or affirm that the information put forth in this petition is true and correct, based upon my personal observations and knowledge. I understand that any false statement, or statement made with reckless disregard for the truth, could result in the furtherance of fraud upon this Court, and could subject me to the full penalty of law.

Correctional Officer

*A L Heard 1083*

Sworn to and Subscribed before me
this 31st day of January, 2006.

*Michael Washington*

**NOTARY PUBLIC**

Petitioner: A.L. Heard
    Address: 320 South Ripley

Montgomery, AL 3610416

Telephone

(wk) 241-2645

3098527 # Al. Driver ID.

# EXHIBIT

# B

# IN THE PROBATE COURT FOR MONTGOMERY COUNTY, ALABAMA

**KAREN NORDELL**
**RESPONDENT**

CASE NO. 06-C88

## ORDER FOR INPATIENT COMMITMENT

In the matter of the sworn petition as filed by **A.L. Heard**, for the involuntary commitment of the above named respondent to a State or designated mental health facility; and this day having been set to hear and consider said petition on its merits; and now comes the said petitioner by and through counsel; **Larry Sasser** and also comes the said alleged by and through counsel, **Chenoa Vick** and it now appears to the Court that it has jurisdiction over said matter and that adequate notice has been perfected as required by law; and on Motion the Court proceeds to hear and consider said petition and any evidence relating thereto; and

The Court finds from the evidence adduced in open hearing and of record that it is clear and convincing that **Karen Nordell** is mentally ill and poses a real and present threat of substantial harm to herself; that the respondent will, if not treated, continue to suffer mental distress and will continue to experience deterioration of the ability to function independently; and that the respondent is unable to make a rational informed decision as to whether treatment for mental illness would be desirable; and that inpatient commitment to the Alabama Department of Mental Health or its designated facility is the least restrictive alternative necessary and available for the treatment of the persons mental illness, it is, therefore;

**ORDERED BY THE COURT** that **Karen Nordell**, a mentally ill person, be and is hereby committed to the Alabama Department of Mental Health for treatment of her mental illness for a period not to exceed 150 days, subject to renewal if found appropriate upon petition and proceedings; that a copy of all medical records pertaining to any prior treatment of the person be forwarded to said State Hospital with said patient; and that the Sheriff of Montgomery County, Alabama, shall forth with take into custody said mentally ill person and deliver her to the proper authorities at **Greil Hospital**.

The Court retains jurisdiction over this matter for such other proceedings and orders as become appropriate.

**DONE AND ORDERED** this 2nd day of February, 2006.

**REESE MCKINNEY, JR.**
**JUDGE OF PROBATE**

JURE 00014 PG 0430

## CERTIFICATION OF JUDGE OF PROBATE OF RESPONDENT TO PSYCHIATRIC HOSPITAL

**STATE OF ALABAMA**
**COUNTY OF MONTGOMERY**

**OFFICE OF**
**JUDGE OF PROBATE**

I, **Reese McKinney, Jr.**, Judge of Probate of the County of Montgomery and State of Alabama, do hereby certify that a sworn petition has been brought before this Court containing allegations that **Karen Nordell**, a resident of **Montgomery** County, is mentally ill, and a substantial threat of harm to self or others; and

that **Karen Nordell** is in need of inpatient treatment at a psychiatric hospital, pursuant to the applicable statutory provisions; and

that a hearing has been conducted regarding this matter, at which sworn testimony has been taken from credible witnesses; and

that the facts and evidence presented in this matter have been fully investigated; and

that by clear and convincing evidence, sufficient proof has been adduced that; **Karen Nordell** is mentally ill; and

that, as a result of the mental illness, **she** poses a real and present threat of substantial harm to self or others;

that, **she** will, without treatment, continue to suffer mental distress and will continue to experience deterioration of the ability to function independently;

that **she** is unable to make a rational and informed decision as to whether or not treatment for mental illness would be desirable;

that appropriate treatment is available and confinement in said treatment facility is necessary for the safety of the respondent or others; and

that said treatment is the least restrictive means necessary to treat said respondent; and the foregoing having been established,

I therefore issue this Certificate of Involuntary Commitment evidencing the commitment of **Karen Nordell** (D.O.B: **01/01/1951**) to the Alabama Department of Mental Health and Retardation for a period of treatment not to exceed 150 days without a subsequent petition and hearing on the matter.

GIVEN UNDER MY HAND this the **3rd** day of **February**, 2006.

*Reese McKinney*

REESE McKINNEY, JR.
JUDGE OF PROBATE

**Commitment Book 14, Page 430**
**Case No. 06-C 88**

# EXHIBIT

# C

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| KAREN JAYNE NORDELL | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | CIVIL ACTION NO. 2:07CV31MHT |
| STATE OF ALABAMA DEPARTMENT | ) | |
| OF MENTAL HEALTH AND MENTAL | ) | |
| RETARDATION, *et al.* | ) | |
| | ) | |
| Respondents. | ) | |

## AFFIDAVIT OF WALTER J. CROOK, M.D

STATE OF ALABAMA
COUNTY OF MONTGOMERY

Before me the undersigned, a notary public in and for the State of Alabama, personally appeared Walter J. Crook, who is known to me and who, being first duly sworn, did depose and say as follows:

1.  My name is Walter J. Crook.  I am over nineteen years of age.  I have personal knowledge of the facts contained herein.

2.  I was a Staff Psychiatrist at Greil Psychiatric Hospital from <u>March 2, 2004</u> until <u>June 15, 2007.</u>        .

3.  In my capacity as a Staff Psychiatrist at Greil Psychiatric Hospital my duties were as follows: Admission and assessment of psychiatric patients, prescribing medications, leadership of treatment teams, documentation in patient records, completion of reports per hospital protocol, participation in hospital committees

4.  I am familiar with the treatment History of Ms. Karen Nordell and I served as her treating physician during her last admission.

1

5.  Ms. Nordell was committed to Greil Hospital by Order of Probate Judge Reese McKinney, on February 2, 2006, after a hearing was held in response to a Montgomery County Correctional Officer filing an Involuntary Petition for Commitment.

6.  Ms Nordell was admitted to Greil Psychiatric Hospital on February 3, 2006. Upon admission to the psychiatric unit the patient was still in restraints. She was very loud and threatening staff. She was using profanity, and spitting and speaking in a raspy voice. She was cursing loudly and using racial slurs. Multiple p.r.n. medications had to be given in order to get the patient to calm down. She was transferred to Greil Hospital in restraints and further p.r.n. medication had to be given to get the patient to calm down. She was extremely agitated and very psychotic and uncooperative.

7.  Upon admission Ms. Nordell was given a provisional diagnosis of Bipolar I Disorder and her diagnosis was later change to Paranoid Schizophrenia. She was started on Risperal, Klonopin, Trazodone, and Depakote. The patient was agitated and using profanity initially during the hospitalization. She was very uncooperative and initially refused to have her physical exam done and refused to take a shower. Her appearance was disheveled.

8.  On February 3, 2006 I determined that due to Ms. Nordell's psychiatric condition the appropriate course of treatment would have to include the administering of psychotropic medications. Since the patient was unable to consent to the administration of psychotropic medication, as required by the Department of Mental Health's policy 430-20, I executed the appropriate paper work authorizing the emergency administration of psychotropic medication. I determined that an emergency situation existed that constituted an exception to the requirement for informed consent. An emergency exists when in the opinion of the treating physician, there is a probability of injury to the patient or to other persons.

9.  When the treatment team met to devise Ms. Nordell's master treatment plan, Ms. Nordell refused to talk to any staff stating she knew her rights and that she was in the CIA and the police department had refused to cooperate with her requested examinations. No prior history was known on Ms. Nordell except that she was in Bryce Hospital on a previous occasion. She was very aggressive upon admission and had to be restrained. She

2

spoke in a very hostile manner when she would speak. Depakote and Risperdal were increased. She stayed in her room excessively initially. During the hospitalization she came out of her room more and was more active. She would not attend groups and classes initially.

10. Initially during the hospitalization Ms. Nordell did receive p.r.n. medication for being loud and refusal to be directed. She eventually became calmer and quieter on the unit.

11. On March 24, 2006, per Departmental policy, I sought a second opinion in reference to the continued need for the emergency administration of psychotropic medication to Ms. Nordell, and Clemmie Palmer, M.D., concurred that the patient continued to present an unsafe situation or would continue to needlessly suffer mental distress and deterioration of function if not treated. It was our combined professional opinions that administration/continuation of medication was clinically necessary at that time.

12. Ms. Nordell stayed in bed excessively initially in the hospitalization, stating that the medication made her sleep day and night. She complained of sedation persistently which caused her to stay in bed day and night. Ms. Nordell was tried off all medications on two different occasions for approximately two weeks each period and she continued to stay in bed all day and night. Therefore, her staying in bed was not considered to be secondary to the medication. She complained of sedation and spent most of the time in bed even on the 200 mg of Seroquel. The Seroquel was discontinued to see how she would do off any psychotic medication and she continued to stay in bed. On 05/20/2006 Abilify 15 mg p.o.q.p.m. was begun. The Abilify was increased to 15 mg p.o.b.i.d.

13. Ms. Nordell continued to be delusional and could describe elaborately delusions regarding an ex-boyfriend, espionage, Presidents Bush and Clinton. After the agitation initially during her hospitalization, she did not exhibit any physically or verbally threatening behavior.

14. Ms. Nordell eventually started spending more time out of her room. She tended to rock back and forth constantly. She was thought to have akathisia. She appeared to be having difficulty sitting still and was restless. Inderal was attempted in order to treat this; however, she stated she has a history of hypertension. She was eventually evaluated for

3

hypertension and was found to have it. She stated that she was treated for hypertension in the past successfully with Toprol; therefore, the Inderal was discontinued and she was placed on Toprol instead. There was, however, only slight improvement in her akathisia.

15. Eventually Ms. Nordell's affect became pleasant. She did not mention her delusion regarding "conspiracy and espionage" unless asked. She had no further behavior problems. Lasix was also added to treat her hypertension. She was tried on an another trial of Risperdal up to 10 mg q.p.m. with Haldol 10 mg p.o. q.p.m. added to the Risperdal. This regimen was ineffective. The Haldol was changed to Navane which was used up to 20 mg q.p.m. Her delusions persisted. An attempt was made to treat her anxiety and akathisia with Klonopin 1 mg p.o. t.i.d. but this was unsuccessful and the Klonopin was decreased and eventually weaned and discontinued. She was started on Invega and weaned off the other antipsychotics and she appeared to have fewer sided effects to the Invega. She was taken off Navane completely as well as Risperdal. She continued to have delusional thinking but she was pleasant when approached. She did get upset from time to time about getting decaffeinated coffee but otherwise she was pleasant and she did not bring up delusional thinking unless asked.

16. Ms. Nordell had two recommitment hearings during the hospitalization. In the first recommitment hearing she cursed the judge. She was recommitted after each hearing.

17. On February 14, 2007, Ms. Nordell had finally gained the capacity to consent to the administration of psychiatric medications and she consented. This consent was in effect until she was discharged on April 3, 2007.

18. Upon my recommendation and with the consensus of the treatment team, Ms. Nordell was discharged on April 3, 2007 in improved condition. She was discharged to the Magnolia Group Home in Troy, Alabama. She is to have close follow up with the mental health center and continue her medications exactly as prescribed.. She still had some delusional thinking but had no behavioral problems. Her sleep and appetite were good. Invega was decreased from 12 mg to 9 mg due to slurred speech. Her "anxiety attacks" improved. She had no suicidal or homicidal ideation. She was placed on Lexapro to help with anxiety.

19. Ms. Nordell has not been a patient at Greil Psychiatric Hospital since April 3, 2007.

Walter J. Crook

Sworn to before me and subscribed in my presence this the ___15<u>th</u>___ day of
___June___, 2007

Notary Public
My Commission Expires: _8 August 2010_

5

# EXHIBIT

# D

# State of Alabama
# Department of Mental Health and Mental Retardation

**NUMBER:**    430-20

**SUBJECT:**    MI Services-Special Treatment Procedures
**TITLE:**        Informed Consent for Psychiatric Medications

**EFFECTIVE:** 12/23/94        **REVIEWED:** 5/5/2004        **CHANGED:** 6/3/05

**RESPONSIBLE OFFICE:**    Mental Illness Division

**APPROVED:**

## I.    POLICY:

Informed consent is an ongoing process. It is a collaborative approach between the psychiatrist and the patient that should, over time, increase the patient's understanding of, and responsibility for, his/her choices and treatment participation. This process should facilitate long-term compliance, improve the therapeutic alliance between the patient and psychiatrist, and support "ownership" of the illness and recovery.

Informed consent cannot be given when information is not communicated in a linguistically and culturally appropriate manner. When the patient has limited English proficiency (as in the case with people for whom English is their second language or who are deaf) it is necessary that information be given in the patient's preferred language. This means that qualified interpreters should be used when the psychiatrist cannot fluently speak the preferred language of the patient.

Each patient admitted to a mental illness facility, either as a voluntary admission or involuntary commitment, who is to receive psychotropic medication, needs to understand the risks and benefits of the proposed treatment, alternative treatments, and no treatment. For psychiatric medications listed in this policy, the attending physician will obtain the informed written consent of the patient or, in the applicable circumstances, follow the procedures set forth in this policy.

## II.    PROCEDURES:

1.    The following drugs require informed written consent:

DMH/MR Policy 430-20

    a.    All antipsychotics, amoxapine (Asendin). metoclopramide (Reglan), or other drugs which may produce tardive dyskinesia.

    b.    Other drugs which require informed consent are covered under their own specific and separate guidelines. Examples are Depo-Provera and Clozaril.

2.    For psychiatric medications listed in Paragraph 1, the attending physician will:

    a.    obtain the informed, written consent of

        i.    the patient who possesses capacity to consent; or

        ii.    the patient's guardian if the patient lacks capacity to consent and has a court appointed guardian; or

        iii.    the patient who possesses capacity to consent and the patient's guardian if the patient has a court appointed guardian; or

    b.    if the patient is a minor, obtain the informed written consent from the patient if 14 years of age or older and obtain the informed written consent from the patient's parent, guardian, or other person or agency specified in a court order. If a patient is less than 14 years of age consent must be obtained from the patient's parent, guardian, or any person or agency specified in a court order.

    c.    follow the procedures set forth in this policy

        i.    if the patient's clinical condition is deemed an emergency, or

        ii.    if a patient possesses the capacity to consent, is involuntarily committed, and refuses the medication; or

        iii.    if a patient lacks the capacity to consent to administration of medication and is involuntarily committed.

3.    Informed consent is defined as a knowing and voluntary decision to take the medication made by a patient who has the capacity to make an informed decision, after the attending physician has discussed with the patient the nature of the illness or target symptoms, and the risks and benefits of the proposed treatment, alternative treatments, and no treatment.

4.    Assessment of capacity to consent to administration of medication.

    a.    Capacity to consent to administration of medication is a clinical opinion that is a separate issue from whether or not the patient agrees to or refuses medication. The attending physician shall conduct an assessment of the patient's capacity to consent to administration of medication.

    b.    In the assessment of capacity to consent to administration of medication, the physician determines the individual's ability to consent to administration of medication based upon, but not limited to, the following:

DMH/MR Policy 430-20

    i.    Mental status examination;

    ii.    Recent and current behavior related to decisional capacity;

    iii.    Available psychosocial data related to decisional capacity;

    iv.    Whether the patient is physically and mentally able to understand the information about the medication;

    v.    The patient's ability to make and express a decision about the medication.

    vi.    The patient's psycho-linguistic level of functioning. (Limited English proficiency is not an indication of diminished capacity. As such, it is important that this assessment be done in the preferred language of the patient with limited English proficiency. If the psychiatrist is not fluent in the preferred language of the patient, a qualified interpreter should be used to ensure that the assessment is appropriate.

    c.    The attending physician will document the decision regarding the assessment of capacity to consent to administration of medication on the consent form, and the other sections of the form are to be completed as appropriate. Pre-printed material on form need not be re-written, but should be circled if relevant. Informed written consent shall remain a part of the patient's record and will reflect the nature and content of information provided to the patient. Informed consent may be withdrawn by the patient at any time. Informed consent is valid for twelve months from the date of completion unless withdrawn by the patient.

5.    An involuntarily committed patient who lacks capacity to consent to administration of medication, who does not have a court appointed guardian, and who does not refuse medication may be administered medication for up to thirty (30) days, if the attending physician determines that the patient will, if not treated, continue to suffer mental distress and will continue to experience deterioration of the ability to function independently and will needlessly suffer and prolong hospitalization.

    a.    If the patient does not obtain the capacity to consent to the administration of medication within thirty (30) days, a concurring opinion must be obtained from a second physician prior to the end of the thirty (30) day period to continue administration of medication to the patient.

    b.    This lack of capacity to consent will be reviewed, at least, annually with a concurring second physician opinion at each such review;

    c.    If at any time the patient obtains the capacity to consent to medication, the attending physician must obtain the informed written consent of the patient by completing a new consent form or, in the applicable circumstances, follow the procedures set forth in this policy.

DMH/MR Policy 430-20

6.     If an involuntarily committed patient who lacks the capacity to consent to the administration of medication and who does not have a court appointed guardian refuses administration of medication, the physician shall request an administrative review by the clinical director or designee and follow the procedures set forth in paragraph 10.

7.     A patient on voluntary admission status who possesses the capacity to consent to the administration of medication may be administered medication only with the informed written consent of the patient, except in emergency situations. A voluntary patient who possesses the capacity to consent to administration of medication and refuses to consent to administration of medication should be discharged, if no alternative treatment is available and appropriate, and the patient does not meet criteria for commitment.

8.     In emergency situations, in order to avoid the possibility of immediate injury to the patient or others or imminent physical or mental deterioration which would be considered potentially life threatening, the following apply.
   a.     Psychiatric medications may be administered for a period not to exceed seventy-two (72) hours without the informed written consent of the patient.
   b.     Prior to the end of this seventy-two (72) hour period, a concurring opinion must be obtained from a second physician before the medication may be continued without the consent of the patient. If the two physicians concur that the patient's psychiatric condition or behavior continues to represent a potential danger to self or others as noted in paragraph 8 above, medications may be continued during the psychiatric emergency but not to exceed thirty (30) days. The attending physician and the consulting physician shall document the reasons medication(s) should be administered without the patient's informed written consent.
   c.     At any time the attending physician determines that the patient no longer requires involuntary emergency psychiatric medication, the medication shall be discontinued.

9.     To continue administration of medication after the medical emergency ends or at the end of the thirty (30) day period set forth in paragraph 8, the attending physician must:
   a.   obtain the informed written consent of the patient if the patient exhibits decisional capacity and agrees to continue the medication,
   b.   discontinue the medication if the patient exhibits decisional capacity, refuses, and does not meet criteria for involuntary emergency treatment,

Page 4 of 5

DMH/MR Policy 430-20

    c.  or determine that discontinuing the medication would be unsafe to the patient or others, and follow the procedures set forth in paragraphs 6 or 10, as applicable.

10.    If an involuntarily committed patient refuses to consent to the administration of medication (regardless of their decisional capacity) when there is no emergency situation or before the end of a thirty (30) day period of involuntary emergency medication (as noted in paragraphs 8 and 9), an administrative review will be held.

    a.  The attending physician shall request an administrative review by the clinical director or designee. The administrative review shall be held within seven (7) days of the request and a decision, with supporting documentation in the medical record, made within three (3) days of the review, during which time medication may be continued in emergency situations.

    b.  The patient shall be informed that a review is being requested.

    c.  The patient advocate at the facility shall be notified of all cases at the time the request for the review is made by the attending physician.

    d.  The facility shall request the patient advocate to represent the patient unless he/she declines such representation.

    e.  The patient shall be permitted to be represented by any person of his/her choosing, including an attorney.

    f.  The Department of Mental Health and Mental Retardation has no obligation to reimburse the patient for any expenses incurred in employing his/her own representative.

    g.  The patient's representative with patient's consent shall have access to the patient's hospital records.

    h.  The patient shall be permitted to consult with an independent expert of his/her own choosing.

    i.  The independent expert may be called by the patient as a witness at the review.

    j.  The independent expert with patient's consent shall have access to the patient's hospital records.

    k.  The Department of Mental Health and Mental Retardation shall not be obligated to reimburse the patient for expenses incurred in employing an independent expert.

    l.  The clinical director or designee shall conduct the review and within three (3) days issue a written decision to be filed in the patient's medical records which affirms or modifies the attending physician's recommendations.

# EXHIBIT

# E

HEARING DATE: _Sept 8, 2006 @ 11:30am_

## IN THE PROBATE COURT FOR MONTGOMERY COUNTY

Karen Nordell                              CASE NO. 06-C 552
RESPONDENT

### PETITION FOR INVOLUNTARY COMMITMENT

Comes now petitioner, Allen Stewart, Director of Greil Hospital; and respectfully represents unto your Honor that Karen Nordell is 55 years of age and is a resident of Montgomery , Alabama; residing at 2140 Upper Wetumpka Road, Montgomery, Alabama 36107 currently located at Greil Hospital and the petitioner has reason to believe that said person is mentally ill; and that such beliefs are based on specific behaviors, acts, attempts, or threats, which are specified and described in detail as follows: Patient continues to experience symptoms of her psychosis. She remains delusional. She lacks insight into her mental illness. She is aggressive towards other patients. She requires daily monitoring of her medication to ensure her compliance. She continues to need a supervised and structured environment. She carries a diagnosis of Schizoaffective Disorder, Bipolar Type. She is incapable of making a rational and informed decision regarding her need for continued care and treatment. She continues to present as a threat of substantial harm to herself and or others.

WHEREFORE, petitioner prays that the Court will take jurisdiction of this matter, that a day be set for a hearing on this petition; that notice of the date, time and place be given to the respondent and that a Guardian ad Litem be appointed to represent said respondent.

I do solemnly swear or affirm that the information put forth in this petition is true and correct, based upon my personal observations and knowledge. I understand that any false statement, or statement made with reckless disregard for the truth, could result in the furtherance if fraud upon this Court, and could subject me to the full penalty of law.

_Director, Greil Hospital_
Petitioner's relationship to respondent:

Sworn to and Subscribed before me
This 6th day of September 2006

Notary Public

Petitioner: Allen Stewart

Address: 2140 Upper Wetumpka Rd.
Montgomery, Alabama 36107
Telephone: 262-0363

# EXHIBIT

# F

IN THE PROBATE COURT FOR MONTGOMERY COUNTY, ALABAMA

<u>KAREN NORDELL</u>                                         CASE NO. <u>06-C 552</u>
RESPONDENT

# ORDER FOR INPATIENT COMMITMENT

In the matter of the Petition for the Inpatient Commitment of **Karen Nordell**, Respondent, as filed by Allen Stewart; and this day having been regularly set to hear and consider said petition; and now comes said petitioner by and through counsel, *Tamara Pharr* Esq., and also comes the said Respondent, by and through counsel, **Will Barfoot**, Esq., and it now appears that the Court has jurisdiction of said matter and that adequate notice has been perfected as required by law; and the Court proceeds to receive evidence; and

The Court finds from clear and convincing evidence adduced in open hearing that:

1. Said Respondent is mentally ill;
2. As a result of the mental illness, Respondent poses a real and present threat of substantial harm to self or others;
3. That as a result of the mental illness the Respondent will, if not treated, continue to suffer mental distress and will continue to experience deterioration of the ability to function independently;
4. That the Respondent is unable to make a rational and informed decision as to whether treatment for the mental illness would be desirable;
5. That there is treatment available for the mental illness diagnosed;
6. That the evidence presented establishes a factual basis for the conclusion that Respondent poses a real and present threat of substantial harm to self and/or others and that confinement is necessary; the Petitioner has thus met the requirement of proving that Respondent's dangerousness has been evidenced by a recent overt act;
7. That inpatient commitment to the Alabama Department of Mental Health and Mental Retardation is the least restrictive alternative necessary and available for treatment of Respondent's mental illness;

Accordingly, said petition is due to be granted; and

**IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED BY THE COURT** that the inpatient commitment of **Karen Nordell**, Respondent, is ordered to the Alabama Department of Mental Health and Mental Retardation, for treatment of mental illness for a period not to exceed 150 days, subject to further renewal if found appropriate upon proper petition and proceedings.

**DONE AND ORDERED this 8th day of September, 2006.**

**KAREN LANEAUX**
**TEMPORARY JUDGE OF PROBATE**

JURE 00015 PG 0251

# CERTIFICATION OF JUDGE OF PROBATE OF RESPONDENT TO PSYCHIATRIC HOSPITAL

**STATE OF ALABAMA**                              **OFFICE OF**
**COUNTY OF MONTGOMERY**                          **JUDGE OF PROBATE**

I, **Reese McKinney, Jr.**, Judge of Probate of the County of Montgomery and State of Alabama, do hereby certify that a sworn petition has been brought before this Court containing allegations that **Karen Nordell**, a resident of **Montgomery** County, is mentally ill, and a substantial threat of harm to self or others; and

that **Karen Nordell** is in need of inpatient treatment at a psychiatric hospital, pursuant to the applicable statutory provisions; and

that a hearing has been conducted regarding this matter, at which sworn testimony has been taken from credible witnesses; and

that the facts and evidence presented in this matter have been fully investigated; and

that by clear and convincing evidence, sufficient proof has been adduced that; **Karen Nordell** is mentally ill; and

that, as a result of the mental illness, **she** poses a real and present threat of substantial harm to self or others;

that, **she** will, without treatment, continue to suffer mental distress and will continue to experience deterioration of the ability to function independently;

that **she** is unable to make a rational and informed decision as to whether or not treatment for mental illness would be desirable;

that appropriate treatment is available and confinement in said treatment facility is necessary for the safety of the respondent or others; and

that said treatment is the least restrictive means necessary to treat said respondent; and the foregoing having been established,

I therefore issue this Certificate of Involuntary Commitment evidencing the commitment of **Karen Nordell** (D.O.B: **01/01/1951**) to the Alabama Department of Mental Health and Retardation for a period of treatment not to exceed 150 days without a subsequent petition and hearing on the matter.

GIVEN UNDER MY HAND this the **8th** day of **September**, 2006.

*Reese McKinney*

REESE McKINNEY, JR.
JUDGE OF PROBATE

**Case No. 06-C552**

# EXHIBIT

# G

United States Court
Middle Division of Alabama
1 Church Street
Montgomery, Alabama

06-01-07P12:15 RC

2:07CV31-MHT

TO: US District Court Clerk — Debra Hackett
Federal Magistrates
Federal Judges        334-265-3496  These calls are
Please assign me a lawyer.    334-264-9134  nice many calls

Re:    Karen Nodell — Plaintiff
illegally held at Greil Hospital (a psychiatric
                                    hospital)
            Defendants
① Alabama State Dept of Mental
   Illness and Mental Retardation
② John Houston — Commissioner
③ Greil Hospital (psychiatric hospital)
   Allen Stewart — Director
   2140 Upper Wetumpka Rd
   Montgomery Alabama
④ Dr Crook (corrupt psychiatrist
   assigned to me)

RECEIVED
2007 JAN -9 P 3: 29
U.S. PLAINTIFF CLK
MIDDLE DISTRICT ALA

    I, Karen Nodell — the Plaintiff has filed a
Writ of Habeas Corpus to be released from Greil
Hospital, and a lawsuit against the Defendants
for 104 million dollars, and I request certain
ORDERS from the Court as soon as possible.

    I need, as soon as possible — an ORDER
from the Court prohibiting Dr Crook or any other
psychiatrist from giving me psychiatric medicine.
Corrupt Dr Crook is trying to turn my mind into a
vegetable and has become close to me to forget the

details of my on-going espionage and political corruption and obstruction of justice the complaints and all the acts of reprisal I've been subjected to by these high level federal government employees who are involved in on-going espionage, political corruption and obstruction of justice.

Please keep in mind that I passed my lie detector tests concerning my on-going espionage and political corruption and obstruction of justice complaint and all of the acts of reprisal I was subjected to ; namely — they would offer a way to rape, assault, and batter me at gunpoint after I left a tape recorded message about their illegal activity for President Clinton about them. Former Pres Bush is involved in Obstruction of Justice. Former Pres Bush is a friend of my ex-boyfriend Terence McCutlen. Terence McCutlen has a friend in the secret service. Terence McCutlen and his high level CIA superior John Bozdemwich and their friend Calvin Reynoso are involved in on-going espionage. Given Pres Bush will do anything and everything to see to it that his friend Terence McCutlen is not investigated, prosecuted, convicted or sent to prison for espionage. Former Pres Bush told the CIA secret service not to put through my telephone calls (with espionage complaints against his friend Terence McCutlen and his high level CIA supervisor John Bozdemwich) through to the CIA Director's office, the CIA Inspector General's office and the CIA Personnel Office. Most telephone calls to the White House are monitored by the secret service. The secret service understands that Pres Clinton didn't get my message, and if they tipped off former Pres Bush and Terence McCutlen and the rest of them that I had attempted to complain about them to President Clinton

Corrupt Ives Dick, Francis McCutler over the rest of them — corrupt Boston Mass FBI Agents — Dale Espy (who covered up my espionage and political and corrupted complaints) sold off a view to rape, assault and batter me at gun point while I was still living in Birmingham Alabama.

It is later also I took his labor to talk about these incidents and I passed. — BUT corrupt Birmingham Alabama FBI employee Alton Sizemore (Asis to what flat time was the U.S. Attorney corrupt Doug John — who — Northern Division of Alabama for Birmingham Alabama or for my espionage and political corruption, my ongoing Justice complaints and my complaints and obstruction of rape, assault and battery at that I had been who was noting the alias I threw Johnson (Alabama CLF-292) featured already the TODAY show on NBC News corruption coverup story that there was rampant corruption coverup the Boston Mass FBI office. I brought forth a lawsuit against the secret service and the Boston Mass FBI office and the Birmingham Alabama FBI office Doug John — for Obstruction of Justice and libel. FBI Director — Robert Mueller received copies of my lawsuits and filed the rest of the members I was valid in my complaints to engage in rogue against me. They pay off a corrupt Medical Doctor to induce me to a corrupt Medical Doctor renursion now, but it could turn back at any time Flowers that I could get corrupt FBI Director Robert Mueller to revise, if I could reach the Deputy Director of the FBI and others. Corrupt FBI Director — Robert Mueller will not protect whistleblowers.

US Senator Charles Grassley (Arizona) trys to
protect whistleblowers

Former Massachusetts Governor William Weld
engaged in political corruption when he silenced
the US Attorney in Boston Mass and this is the ongoing
matter. Notorious Boston Mass gangster - Whitey
Bulger is still on the FBI's 10 most wanted list.
William Weld had enough evidence to prosecute
James Whitey Bulger - but allowed his brother -
William Bulger (who was president of the Massachusetts
State Senate) to talk him out of prosecuting him.
Brother 3 convicted Docket Mass FBI agents are
finally in prison who they tipped off James
Whitey Bulger to leave Massachusetts because he was a
suspect in 30 murder investigations.

Plaintiff has many complaint to US.
Senator Richard Shelby - Ala - because US Senator
Richard Shelby is just as corrupt as his best
friend - former Pres Bush.

The current Pres Bush will do anything because
to see to it that his father - former Pres Bush
is not investigated, prosecuted, convicted and to -
prison for obstruction of Justice.

My Constitutional and civil Rights are being
violated by the individuals I've named in my
complaints - I have the right to present and pursue a
grievance without being subjected to refused
redress or retaliation. The individuals I've named
in my on-going espionage and political corruption and
obstruction of Justice complaint have subjected me to all
kind of refused - retaliation. They have falsely
accused me of being mentally ill (in order to destroy
my credibility), and paid off corrupt psychiatrists

like Dr Crook to lie and say that I'm mentally ill, they're interfered with my job potential as a Counselor, therapist, they had me falsely arrested to destroy my credibility, they've had me illegally evicted 11 times — even though my rent was paid up, they paid off a man to beat me up, they paid off a man to rape, assault and batter me at gunpoint, they've tampered with my meal, had me infected with a virulent pneumonia virus ( I almost died — I was in a coma for 4 weeks). They paid off a corrupt medical doctor to induce me to develop cancer.

A On Nov 21, 2005 Montgomery Alabama Police officer H.G. Wells freely admitted that former Pres Bush told him to evict me (illegally) from the Capitol Inn hotel on Nov 17, 2005 ( even though my hotel room rent was paid up) and again from the Salvation Army Homeless Shelter on Nov 21, 2005 (even though I was a tenant — guest, — resident in good standing with the Daytime manager). and Officer H.G. Wells freely arrested me for trespassing like I refused to leave the homeless shelter (I had 5 fighters on me and me when to go) originial After the booking process was over with, the police wouldn't let me use the phone at the jail. I was held at the Montgomery, Alabama Municipal City Jail from Nov 21, 2005 — Feb 2, 2006 — All the corrupt guards admitted they received money from the individuals I've named in my on-going espionage and political corruption and obstruction of Justice complaint not to let me use the phone

They killed the little unborn baby boy or baby girl my babymake and I was expecting. They kept me totally "incommunicado".

On Feb 2, 2006 I was twice posted by 2 Deputy Sheriffs to Baud Hospital - a psychiatric hospital. On August 30, 2006 I found out that there was a Probate Court hearing in my absence on Feb 2, 2006. However showed me a Probate Court Petition or told me about any Probate Court hearing. No lawyer ever came to my cell at Hospital representing me for the transporting charge or a Probate Court hearing. I have no mental illness, and I have medical & chore training and legal training.

Corrupt Dr Clock keeps lying about when I can be released from the hospital. Staff claims they are trying to find a group home for me to go to, but I don't believe they are. Corrupt Dr Crook is being paid off by the individuals I'm named in my civil suit convictions corruption and Obstruction of Justice complaint to destroy my mind with more increasing amounts of psychiatric medicine.

I need (as soon as possible) a restraining order to keep Dr Crook or any other psychiatrist from giving me psychiatric medicine. They are trying to destroy my brain analytical, legal, scholarly mind and to erase from my memory the facts of my complaints.

Shortly after I passing my lie detector tests I was falsely arrested by the Secret Service and illegally held in a facility for 4 years for a crime I did not commit. The psychiatrist there and his

(Previous) psychologist admitted they got monthly checks from former Pres Bush to keep users that facility for a crime I did not commit. I was not convicted of this crime but illegally held at the Mental Health Unit of this facility.

When I tell these corrupt psychiatrists and psychologists that my on-going espionage and political corruption and obstruction complaint was covered up by high level federal government employees they outrageously label me as delusional and paranoid schizophrenic. I don't have any mental illness except for anxiety attacks. The more corrupt Dr Crook is trying to turn my mind into a vegetable with all his psychiatric medicine that he forces me to take and he must be legally stopped.

Also I need the Court to issue an ORDER that the staff of Greil should give me 4 cups of caffeinated coffee a day (my family provides me with coffee). The staff will only give me no caffeinated coffee 1 time a day - at 4:00 PM. minimum - 4 cups of caffeinated coffee at 4:00 PM. I need at least keen, analytical and scholarly legal mind intact. Some of the staff should go to jail for Obstruction of Justice because they interfere with my letter writing about my on-going espionage, and political corruption and Obstruction of Justice complaint. The Hospital should be ~~fined~~ fined $1 Million dollar per day for each day they refuse to give me 4 cups of coffee (caffeinated coffee a day). I have a medical need for caffeinated coffee.

Of course I want my Writ of Habeus Corpus petition granted and I want a substantial portion of the 10 Million dollars for damages before I leave the Hospital.

. But the first thing that must happen is a Court Restraining Order be granted to keep corrupt Dr ~~Cook~~ or any other psychiatrist from giving me psychiatric medicine, and a Court ORDER that the staff has to give me 4 cups of caffeinated coffee a day.

Thank Jenifer your assistance.

Respectfully submitted
Karen Wordell —
Plaintiff

PS. This psychiatric medicine is causing me to lose sore, stiff Muscles. too.

# EXHIBIT

# H

February 2, 2007 @ 9:30 a.m.

# IN THE PROBATE COURT OF MONTGOMERY COUNTY, ALABAMA

__Karen Nordell__                          CASE NO.___07-C 063___
**RESPONDENT**

## PETITION TO RENEW INPATIENT COMMITMENT

**TO:  Honorable Reese McKinney, Jr., Judge of Probate**

Comes now your Petitioner, Allen L. Stewart, LPC, as the Director of Greil Memorial Psychiatric Hospital, and does hereby request that the commitment order for the above named Respondent, Issued by the Probate Judge of Montgomery County on the 8th day of September, 2006 be renewed for the following reasons (in detail):

**The patient carries a diagnosis of Schizophrenia, Paranoid Type. Patient continues to state that her psychiatrist, President Bush, and others are involved in ongoing retaliatory efforts to harm her. She believes there is a conspiracy against her. Patient becomes agitated when told that her delusions aren't true. Her hygiene continues to be poor. Patient would likely stop taking medication without supervision.**

Further, your Petitioner is of the opinion that less restrictive conditions of treatment for the Respondent are not appropriate for the following reasons (in detail):

**The patient is unable to make rational and informed decisions regarding her need for treatment. Patient insists that her delusions are true, and that her only problem is anxiety, and states that she does not need treatment. She would likely stop taking her medication without supervision and would become psychotic. Her condition would rapidly deteriorate without continued treatment.**

Your petitioner now prays the Court will take jurisdiction over this matter and conduct such proceedings as are required and grant the renewal of the aforesaid commitment order. Petitioner prays for such other and different relief as entitled, the premises considered.

Signed this the 29th day of January 2007.

_____Allen L. Stewart_____
**Signature of Petitioner**

Subscribed to and sworn before me this the 29th day of January 2007.

# EXHIBIT

# I

## IN THE PROBATE COURT FOR MONTGOMERY COUNTY, ALABAMA

<u>KAREN NORDELL</u>
**RESPONDENT**

CASE NO. <u>07-C63</u>

## ORDER RENEWING INPATIENT COMMITMENT

In the matter of the Petition to Renew the Inpatient Commitment of **Karen Nordell**, Respondent, as filed by Allen L. Stewart; and this day having been regularly set to hear and consider said petition; and now comes said petitioner by and through counsel, <u>Tamara Pharrams</u>, Esq., and also comes the said Respondent, by and through counsel, <u>Ed Parish, Jr.</u>, Esq., and it now appears that the Court has jurisdiction of said matter and that adequate notice has been perfected as required by law; and the Court proceeds to receive evidence; and

The Court finds from clear and convincing evidence adduced in open hearing that:

1.  Said Respondent is mentally ill;
2.  As a result of the mental illness, Respondent poses a real and present threat of substantial harm to self or others;
3.  That as a result of the mental illness the Respondent will, if not treated, continue to suffer mental distress and will continue to experience deterioration of the ability to function independently;
4.  That the Respondent is unable to make a rational and informed decision as to whether treatment for the mental illness would be desirable;
5.  That there is treatment available for the mental illness diagnosed;
6.  That the evidence presented establishes a factual basis for the conclusion that Respondent poses a real and present threat of substantial harm to self and/or others and that confinement is necessary; the Petitioner has thus met the requirement of proving that Respondent's dangerousness has been evidenced by a recent overt act;
7.  That inpatient commitment to the Alabama Department of Mental Health and Mental Retardation is the least restrictive alternative necessary and available for treatment of Respondent's mental illness;

Accordingly, said petition is due to be granted; and

**IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED BY THE COURT** that the inpatient commitment of **Karen Nordell**, Respondent, is renewed to the Alabama Department of Mental Health and Mental Retardation, for treatment of mental illness for a period not to exceed one year, subject to further renewal if found appropriate upon proper petition and proceedings.

**DONE AND ORDERED this 2nd day of February, 2007.**

**WILLIAM R. DAVIS**
**SPECIAL JUDGE OF PROBATE**

JURE 00015 PG 0457

**Re-Commitment**

## CERTIFICATION OF JUDGE OF PROBATE OF RESPONDENT TO PSYCHIATRIC HOSPITAL

**STATE OF ALABAMA**　　　　　　　　　　　**OFFICE OF**
**COUNTY OF MONTGOMERY**　　　　　　　　**JUDGE OF PROBATE**

I, Reese McKinney, Jr., Judge of Probate of the County of Montgomery and State of Alabama, do hereby certify that a sworn petition has been brought before this Court containing allegations that Karen Nordell, a resident of Montgomery County, is mentally ill, and a substantial threat of harm to self or others; and

that Karen Nordell is in need of inpatient treatment at a psychiatric hospital, pursuant to the applicable statutory provisions; and

that a hearing has been conducted regarding this matter, at which sworn testimony has been taken from credible witnesses; and

that the facts and evidence presented in this matter have been fully investigated; and

that by clear and convincing evidence, sufficient proof has been adduced that; Karen Nordell is mentally ill; and

that, as a result of the mental illness, she poses a real and present threat of substantial harm to self or others;

that, she will, without treatment, continue to suffer mental distress and will continue to experience deterioration of the ability to function independently;

that she is unable to make a rational and informed decision as to whether or not treatment for mental illness would be desirable;

that appropriate treatment is available and confinement in said treatment facility is necessary for the safety of the respondent or others; and

that said treatment is the least restrictive means necessary to treat said respondent; and
the foregoing having been established,

I therefore issue this Certificate of Involuntary Recommitment evidencing the recommitment of Karen Nordell (D.O.B 1/1/1951) to the Alabama Department of Mental Health and Retardation for a period of treatment not to exceed one (1) year, subject to further renewal if found appropriate upon proper petition and proceedings.

GIVEN UNDER MY HAND this the 2nd day of February, 2007.

*Reese McKinney*

Reese McKinney, Jr.
Judge of Probate of Montgomery County

**Case No. 07-C 063**

# EXHIBIT

# J

CONFIDENTIAL AND PRIVILEGED
FOR PROFESSIONAL USE ONLY  •  NOT FOR PUBLICATION
NOT TO BE USED AGAINST PATIENT'S INTEREST

A
D
D
R
E
S
S
O
G
R
A
P
H

*K. Nordell*

## GRIEL HOSPITAL·
### Consent for Administration of Psychiatric Medications

**Section A-1**

Does patient have the capacity to make an informed decision? ___*yes*___

**Section A-2**    (Complete on all patients receiving medications listed in DMH-MR Policy 430-20)

Class or name of medication: ___*Neuroleptic*___

Reason/anticipated benefit: ___*Prevent harm to self or others*___

Possible side effects/toxic effects were discussed.  The patient was told to inform staff in the event of any problems possibly related to medication.

*dystonia  Parkinsonian symptoms, akathesia*
*tardive dyskinesia; elevated blood glucose, cholesterol*
*or triglycerides*

Consequences if not administered (include persistence and potential worsening of psychotic symptoms.)

*Harm to self or others*

Current medical problems requiring precautions: _____

Describe: _____

**In my professional opinion, any potentially harmful side-effects of this medication
are outweighed by the anticipated benefits.**

___*Walter Cypur*___                              ___2-14-07___
PHYSICIAN'S SIGNATURE                                    DATE

**NOTE:** 1.  If patient has the capacity to consent go to **Sections B and C**.
      2.  If this is an emergency go to **Section D**.
      3.  If patient lacks capacity to consent and does not refuse medication go to **Section E**.

**Section B**

I have been informed as to the reasons for the use of the above described medication, including the anticipated benefits, and advised as to any potentially serious side-effects and had an opportunity to ask questions. I have also been informed of the potential consequences if I do not receive this medication. I hereby approve the use of the medication described above as part of my plan of treatment.

Signed: X ___*Karen Nordell*___                    ___2/14/07___
Patient or person authorized to consent for patient           DATE

Witness: ___*Nan Jenkins RN*___                     ___2/14/07___
                                                              DATE

**NOTE:** If patient approves, go to **Section C**

A
D
D
R
E
S
S
O
G
R
A
P
H

*K. Nordell*

**Section C**   Informed Consent (to be completed if the patient signs.)

I hereby certify that, in my professional opinion, *Karen Nordell*
has given his/her expressed and informed consent for the use of the medication described above.
Expressed and informed consent is defined as the uncoerced decision of a patient who has comprehension
and can signify assent or dissent.

_____    *2-14-07*
PHYSICIAN'S SIGNATURE                              DATE

**Section D**

An emergency is generally recognized as constituting an exception to the requirement for informed consent.
An emergency exists when in the opinion of the treating physician, there is a probability of injury to the
patient or other persons.

_____    _____
PHYSICIAN'S SIGNATURE                              DATE

**Section E**   Complete when a second opinion is required:

☐ Emergency administration extends beyond 72 hours and is recommended up to 30 days.
              **OR**
☐ The patient lacks capacity to consent and does not refuse medication.   (Complete within 30 days.)

The patient presents an unsafe situation or will continue to needlessly suffer mental distress and deterioration of
function if not treated. It is our combined professional opinions that administration/continuation of medication is
clinically necessary at this time.

_____    _____
ATTENDING PHYSICIAN'S SIGNATURE                     DATE

_____    _____
CONSULTING PHYSICIAN'S SIGNATURE                    DATE

**Section F**   Complete after 30 days only if:

The patient's psychiatric condition remains such that continuation of antipsychotic medication is considered
necessary, and

☐ The patient has gained the capacity to consent and has signed Section B.
              **OR**
☐ The patient lacks capacity to consent and refuses medication. The case is being forwarded to the
   Clinical Director for review.

_____    _____
ATTENDING PHYSICIAN'S SIGNATURE                     DATE

**NOTE:**  Consent is in effect for 12 months from the date signed and may be withdrawn at any time.